Walter Milton CORRELL, Jr., Petitioner,

v.

Charles E. THOMPSON, Warden,
Mecklenburg Correctional
Facility, Respondent.

Civ. A. No. 91–131–R.

United States District Court,
W.D. Virginia,
Roanoke Division.

Aug. 24, 1994.

Michaux Raine, III, Raine and Perdue, Rocky Mount, VA, Robert Eugene Pokusa, Paul, Hastings, Janofsky & Walker, Joseph D. Tydings, Anderson, Hill & Olick, Washington, DC, for petitioner.

Katherine Pharis Baldwin, Office of the Atty. Gen., Richmond, VA, for respondent.

## MEMORANDUM OPINION

TURK, District Judge.

Petitioner, a Virginia inmate, brings this petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner raises multiple claims relating to his conviction of capital murder and subsequent death sentence. Respondent has filed a motion to dismiss supported by the state court records. Petitioner, through counsel, has responded with a brief in opposition. A hearing was held in this matter on December 21, 1993. On May 3, 1994, this court granted the respondent's motion to dismiss.[1] The petitioner filed a motion to amend or alter judgment pursuant to Federal Rule of Civil Procedure 59(e). A hearing was held on the Rule 59(e) motion on July 22, 1994. On July 29, 1994, the court granted the petitioner's Rule 59(e) motion and vacated the June 28, 1994 memorandum opinion and final order.

Upon careful consideration of the record, the applicable law, the briefs submitted by the parties, and the arguments presented by counsel at the hearing, the court finds that the petition for writ of habeas corpus must be granted.

## I. PROCEDURAL BACKGROUND

On August 11, 1985, Charles W. Bousman was robbed and murdered in Franklin County, Virginia. Petitioner was arrested on August 16 after being implicated by the statements of the other two persons involved in the crime, John Dalton and Richard Reynolds. On August 16, Petitioner gave two statements: one to Detective A.H. Dudley of the Roanoke City Police Department and one to Investigator W.Q. Overton, Jr. of the Franklin County Sheriff's Department. On August 18, petitioner was taken to Appomat-

---

1. In response to a Rule 60(b) motion by the petitioner, the court vacated the May 3, 1994 opinion and reentered the same opinion and order on June 28, 1994.

tox, Virginia for a polygraph examination. Following the polygraph examination, petitioner was taken to the Franklin County Jail in Rocky Mount, Virginia. While at the Franklin County jail, the petitioner gave a third statement to Investigator Overton.[2] Petitioner was charged with robbery and murder in commission of a robbery while armed with a deadly weapon and pled not guilty in the Franklin County Circuit Court. Petitioner, with the consent of the Commonwealth, waived his right to a jury trial.

On March 5, 1986, petitioner was tried and convicted on both counts by Franklin County Circuit Court Judge B.A. Davis, III. After a separate sentencing hearing on May 5, 1986, the same judge sentenced petitioner to life imprisonment on the robbery charge and to death on the murder charge based upon the vileness of the crime.

Petitioner appealed his conviction to the Virginia Supreme Court, which affirmed the conviction and sentence on January 16, 1987. *Correll v. Commonwealth*, 232 Va. 454, 352 S.E.2d 352 (1987). Petitioner then filed a petition for writ of certiorari with the United States Supreme Court. The petition was denied on June 15, 1987, with Justices Brennan and Marshall dissenting. *Correll v. Virginia*, 482 U.S. 931, 107 S.Ct. 3219, 96 L.Ed.2d 705 (1987).

On August 15, 1987, petitioner filed a petition for writ of habeas corpus in the Franklin County Circuit Court. On October 26, 1988, the circuit court judge held a hearing on the respondent's motion to dismiss. The court granted the respondent's motion as to all claims except those relating to ineffective assistance of counsel and ordered that a plenary hearing be held on the issue of ineffective assistance of counsel claims. On August 15, 1989, a hearing was held in the Circuit Court of Danville before Judge James F. Ingram. In an Order entered January 29, 1990, Judge Ingram adopted the respondent's proposed findings of fact and conclusions of law and dismissed the petition for writ of habeas corpus. The Virginia Supreme Court denied petitioner's appeal from this ruling on August 1, 1990. Petitioner filed a petition for a writ of certiorari with the United States Supreme Court; the Court denied this petition on January 7, 1991, with Justice Marshall dissenting. Petitioner now brings the instant petition for writ of habeas corpus in this court.

In his petition, the petitioner alleges the following claims:

A. His constitutional rights under the Fifth and Fourteenth Amendments to the United States Constitution were violated by the introduction into evidence of a statement to the police taken after three days of serial interrogation, where his request for the presence of an attorney during the first interrogation was not honored and he was legitimately continuing to seek counsel:

  1. he did not waive his right to counsel;

  2. his statement which was admitted into evidence was the tainted product of prior involuntary statements;

  3. he did not knowingly and voluntarily waive his right to counsel;

B. He was deprived of his constitutional rights by the ineffective assistance of counsel at both the guilt and penalty phases of the trial and on appeal in the following respects:

  1. counsel failed to adequately investigate and elicit sources of available evidence, specifically in that:

    a. counsel failed to investigate evidence regarding petitioner's defense;

    b. counsel failed to investigate and elicit evidence of the circumstances surrounding petitioner's statements to law enforcement officers;

    c. counsel failed to investigate and elicit evidence regarding the nature of the victim's death;

    d. counsel failed to investigate the background of petitioner and the other defendants and the admissions of defendant Richard Reynolds concerning Mr. Bousman's death;

    e. counsel failed to investigate and elicit evidence that defense counsel

---

**2.** This was the second statement that the petitioner had given to Investigator Overton.

thought might alienate the community;

f. counsel failed to investigate and elicit evidence to contradict the codefendants' statements;

2. counsel knowingly and intentionally misrepresented to the court the basis for their request to waive a jury trial and failed to investigate and advise petitioner regarding the waiver of a jury trial;

3. counsel failed to present an adequate defense at trial;

4(a). counsel failed to challenge or question the professional competency of the pretrial evaluations of petitioner by court-appointed psychiatrists

4(b). counsel failed to seek a neurological examination or continuance of the trial based on petitioner's incapacity;

5. counsel failed to adequately advise petitioner of the consequences of waiving a jury trial;

6. counsel failed to present off-setting evidence related to the vileness of Mr. Bousman's murder;

7. counsel failed to introduce other significant mitigating evidence related to petitioner's psychological defects, incapacity, and mental retardation;

8. counsel rendered ineffective assistance on appeal and failed to adequately raise and preserve issues for appeal;

C. Petitioner's waiver of his right to a jury trial was not voluntary, knowing, or intelligent;

D. Petitioner was deprived of his constitutional rights when the psychiatrists appointed before trial failed to conduct adequate and reliable evaluations of him;

E. Virginia's standard of vileness for imposing the death penalty is unconstitutional on its face and as applied in petitioner's case;

F. Petitioner was deprived of his constitutional rights by the failure of the Commonwealth to provide exculpatory materials to his counsel prior to trial;

G. Imposition of petitioner's death sentence was unconstitutional because the Virginia Supreme Court failed to engage in an adequate and thorough review of death penalty decisions;

H. Imposition of petitioner's death sentence was excessive and disproportionate to the penalties imposed in similar cases;

I. The Virginia death penalty statute is unconstitutional because it has been applied in a discriminatory manner;

J. The introduction of evidence related to dismissed charges violated petitioner's constitutional rights;

K. The trial court failed to consider the mitigating circumstances of the crime in imposing a sentence of death;

L. The evidence of vileness was insufficient to support the imposition of a death sentence;

M. The trial court denied petitioner's due process rights in denying his motion for a post-sentence report as required by Va.Code Ann. § 19.2–264.5;

N. Imposition of petitioner's death sentence constitutes cruel and unusual punishment.

## II. ANALYSIS

### A. Non-exhausted Claims

■ The court finds that Claim B(2) has never been presented to any state court. Also, Claims B(4)(a), B(8) and G were presented in the state habeas petition, but were not raised on the state habeas appeal or on direct appeal. In order to give state courts the opportunity to pass on the constitutionality of their criminal convictions, a federal court should dismiss without prejudice a state prisoner's petition for habeas relief if it appears that the petitioner has not exhausted his available state remedies. *Preiser v. Rodriguez,* 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973). Where a petition includes both exhausted and non-exhausted claims, the court must dismiss the entire petition, so that petitioner may sever or delete his non-exhausted claims and refile the petition containing only the exhausted claims. *Rose v. Lundy,* 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982). An exception to this rule is where a petitioner has not presented

his claims to the highest state court but it is clear that the state's law would bar review. However, although exhaustion is not required, federal review is precluded. *Teague v. Lane,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989); *Bassette v. Thompson,* 915 F.2d 932 (4th Cir.1990), *cert. denied* 499 U.S. 982, 111 S.Ct. 1639, 113 L.Ed.2d 734 (1991).

■ In this case, if petitioner now were to bring Claim B(2) before the Virginia Supreme Court, it would be barred under Virginia Code § 8.01–654(B)(2).[3] Furthermore, if he were to file a new state habeas petition containing this claim, it would be barred under the rule in *Slayton v. Parrigan,* 215 Va. 27, 205 S.E.2d 680 (1974), *cert. denied* 419 U.S. 1108, 95 S.Ct. 780, 42 L.Ed.2d 804 (1975).[4] Claims B(4)(a), B(8) and G were raised in the state habeas petition, but not in the appeal of the denial of that petition. Failure to assert a claim on appeal of the denial of the first state post-conviction petition bars federal review, absent cause and prejudice. *Coleman v. Thompson,* 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *see, Whitley v. Bair,* 802 F.2d 1487 (4th Cir.1986), *cert. denied,* 480 U.S. 951, 107 S.Ct. 1618, 94 L.Ed.2d 802 (1987). Petitioner has not alleged cause and prejudice for his failure to raise these claims on appeal of his state habeas petition. Therefore, Claims B(2), B(4)(a), B(8) and G must be dismissed.

### B. *Procedurally Barred Claims*

■ The Court also finds that Claims C, D, E, I, J, and N are barred from consideration by this court as a result of their dismissal by the Virginia Supreme Court pursuant to *Slayton v. Parrigan,* 215 Va. 27, 205 S.E.2d 680 (1974), *cert. denied,* 419 U.S. 1108, 95 S.Ct. 780, 42 L.Ed.2d 804 (1975), for fail-

ure to raise the claims at trial or on direct appeal. The state court's finding of procedural default is entitled to a presumption of correctness in federal court. *Clanton v. Muncy,* 845 F.2d 1238 (4th Cir.), *cert. denied,* 485 U.S. 1000, 108 S.Ct. 1459, 99 L.Ed.2d 690 (1988).

■ When a petitioner fails to comply with state procedural requirements, which provides an adequate and independent ground for the state's denial of relief, federal habeas review is barred. There are two exceptions to this rule: (1) where the petitioner makes a showing of cause and prejudice or (2) where a constitutional violation probably has resulted in the conviction of one who is actually innocent. *Harris v. Reed,* 489 U.S. 255, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989); *Murray v. Carrier,* 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986); *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

■ To establish cause, petitioner must show denial of effective assistance of counsel or some factor external to the defense that impeded compliance with the state procedural rule. *Carrier,* 477 U.S. at 492, 106 S.Ct. at 2647. To establish prejudice, petitioner must show that the errors worked to his actual and substantial disadvantage, infecting the entire trial with error of constitutional magnitude. *Id.; United States v. Frady,* 456 U.S. 152, 170, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982).

■ In Claim B(8), petitioner has alleged ineffective assistance of counsel in failing to raise the constitutional issues contained in his federal habeas petition at trial or on appeal. Ineffective assistance on appeal would constitute cause for petitioner's procedural default. As discussed *supra,* claim B(8) is procedurally barred because

---

**3.** This section provides that the failure to include in the first state habeas petition allegations the facts of which were known to the petitioner precludes the grant of relief on those allegations in any later state habeas petition. The petitioner has presented no allegation that the facts of Claims B(2) and B(4)(a) were not known to him at the time he filed his state habeas petition. He similarly advances no assertion of ineffective assistance of counsel as cause necessary to overcome a procedural bar. *See Wainwright v. Sykes,*

433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

**4.** Under this rule, state habeas review is barred by the failure to raise the issue at trial and direct appeal. Again, petitioner has not alleged any ineffective assistance of his trial or appellate counsel that would demonstrate the cause necessary to overcome a procedural bar. *See Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

petitioner failed to present it to the Virginia Supreme Court on appeal of his state habeas petition. Petitioner cannot rely on ineffective assistance as cause for procedural default when he also has defaulted on the ineffective assistance claim, unless he first establishes cause and prejudice for the default of the ineffective assistance claim. *Justus v. Murray*, 897 F.2d 709 (4th Cir.1990). Petitioner has not alleged cause and prejudice for his default of Claim B(8) nor has petitioner demonstrated cause and prejudice for his procedural default. Also, petitioner has not alleged that he is actually innocent. Therefore, the court dismisses Claims C, D, E, I, J, and N as procedurally defaulted.

■ Respondent asserts that Claims B(1)(b), B(1)(c), B(1)(d), B(3), B(4), B(6), and B(7) are procedurally defaulted for failure to raise these claims on state habeas appeal. None of these claims were presented to the Virginia Supreme Court on direct appeal, except for Claim B(4)(b). The court finds that the other six claims were raised on appeal of the state habeas petition. Accordingly, the court does not find these claims to be procedurally defaulted.

Therefore, the court must review Claims A(1), A(2), A(3), B(1)(a-f), B(3), B(4)(b), B(5), B(6), B(7), F, H, K, L, and M.

## C. *Claim A: Fifth Amendment Violations*

In Claim A, petitioner alleges that his Fifth and Fourteenth Amendment rights were violated by the admission into evidence of his August 18 statement to Detective Overton. Respondent asserts that this claim should be barred under *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). The United States Supreme Court, however, has stated that *Stone v. Powell* does not apply to Fifth Amendment claims. *Withrow v. Williams*, —— U.S. ——, 113 S.Ct. 1745, 123 L.Ed.2d 407 (1993). Accord-

ingly, this Court will address Claim A on its merits.

The two taped statements given by the petitioner on August 16, the first of which followed his request for an attorney, were suppressed by the trial court. However, the taped statement given to Detective Overton (the "third statement") on August 18 was admitted into evidence at trial.[5] Petitioner presents two separate theories to support his argument that his third statement should have been suppressed by the trial court: (1) since he had made a request for counsel before his first statement was taken on August 16, the taking of the third statement violated *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), and (2) even if the taking of the third statement did not violate *Edwards,* it was the tainted product of the first two unconstitutionally-obtained statements.

### 1. *Factual Background of the Third Statement*

As stated *supra,* the petitioner gave two statements on August 16 while in custody in Roanoke. The first of these two statements (the "first statement") was given to Detective A.H. Dudley of the Roanoke City Police. At approximately 5:00 p.m. on August 16, the petitioner was placed in an interview room in the detective division of the Roanoke City Police Department. Transcript of February 5, 1986 hearing ("Feb. Tr.") at p. 12. At this time, Detective Dudley began questioning the petitioner and informed him that he had "been implicated by the statements of two other people." Feb. Tr. at pp. 12–13. After "a period of time,"[6] the petitioner stated that he wanted to speak with an attorney.[7] Feb. Tr. at p. 13; Transcript of Correll's First Statement ("Correll Tr. 1") at Page 1, Question 7. After petitioner requested an attorney, Detective Dudley continued to talk with the petitioner. Feb. Tr. at 13–14. When

---

5. Petitioner's motion to suppress the third statement was litigated at the time of its proposed admission into evidence at trial.

6. The petitioner testified that it was approximately thirty or forty minutes after he was placed in the room. Feb. Tr. at p. 27.

7. This request was not honored for at least the next fifty hours. The petitioner was not allowed to consult with an attorney nor was an attorney present for any of the many interrogations that occurred between 5 p.m. on Friday when he was arrested and 7 p.m. on Sunday when the third statement was completed.

asked why he did not immediately terminate the questioning, Dudley stated that he was waiting for the petitioner to specify whether or not he wanted a public defender. Feb. Tr. at pp. 13 and 19–20. Dudley then played a tape recording of one of Dalton's statements. Feb. 5. Tr. at p. 14; Correll Tr. 1 at P. 2, Q. 15. After listening to this taped statement, the petitioner gave the first statement, which began at 7:08 p.m.[8] and ended at 7:34 p.m.

The second statement was given to Investigator Overton of the Franklin County Sheriff's Department. Investigator Overton never gave testimony concerning the second statement. All that is known, other than what is contained in the statement itself, is that it was taken on August 16 in Roanoke. The transcript does not indicate when the second statement began; however, it ended at 11:58 p.m.

On August 18, the petitioner was taken from Roanoke to the State Police Headquarters in Appomattox by Investigator Ferguson of the Franklin County Sheriff's Department for the purpose of undergoing a polygraph examination. Transcript of Circuit Court Habeas Hearing ("Habeas Tr.") at p. 77. The custodial transportation order permitted Ferguson to take the petitioner to Appomattox and directed that the petitioner was to be returned to Roanoke after the polygraph was completed. Habeas Tr. at 78. Instead of returning the petitioner to Roanoke, Detective Ferguson took him to the Franklin County Jail. *Id.* The petitioner was fingerprinted and photographed by Detective Ferguson; however, the petitioner was never officially "logged" into the jail. Habeas Tr. at pp. 82–83. Detective Ferguson then went to the Sheriff's Department and informed the Sheriff of the polygraph results. Habeas Tr. at p. 84. Investigator Overton and the Commonwealth's Attorney were also present at this time. Habeas Tr. at pp. 84–86. Detective Ferguson testified that, although "[i]t's been suggested a lot," he did not recall in-

forming Overton that the petitioner wanted to talk to him. Habeas Tr. at p. 86–87.

Detective Overton testified that he took petitioner from the jail to the Sheriff's Department after petitioner had asked to talk with him. Trial Tr. at p. 100. Petitioner testified that he only asked to telephone his parents, that he did not know why Overton took him to the Sheriff's Department, and that Overton told him he could make the call after they returned. Trial Tr. at pp. 112–14. Petitioner denied ever asking to speak with Overton. Trial Tr. at p. 112. Both Overton and the petitioner testified, however, that on the way to the Sheriff's Department, petitioner told Overton that he could explain what had gone wrong with the polygraph examination. Trial Tr. at pp. 110 and 116. Overton told petitioner to wait until they got to his office. Trial Tr. at p. 110. In the office, Overton turned on a tape recorder and read petitioner his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Transcript of Correll's Third Statement ("Correll Tr. 3") at pp. 1–2. Petitioner waived his rights, did not ask for an attorney, and proceeded to discuss the polygraph examination. *Id.* Following this statement, petitioner stated that he did not want to discuss the matter any further and Overton turned off the tape. Correll Tr. 3 at p. 13. Before they left the office, petitioner confessed to killing Bousman.[9] Overton asked him if he would repeat the confession on tape. Overton turned on the tape recorder and read the petitioner his *Miranda* rights. Correll Tr. 3 at p. 14. Petitioner then made a statement in which he admitted to being the first to throw the knife into the victim's chest. *Id.*

### 2. *Claims A(1) and A(3)*

Petitioner claims that the third statement was taken in violation of *Edwards v. Arizona*, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). In *Edwards*, the ac-

---

**8.** The petitioner had already been questioned by Dudley for approximately two hours before the first statement was taken.

**9.** Overton's report, which is attached to the third statement, states that after he turned off the tape, the petitioner "fell forward from the seat he was

seated in and grabbed his hair and stated, 'I killed him.' I asked Walter what happened. He stated, 'I threw the knife into his chest, then Richard pulled it out and stuck him in the neck, then I got the knife again and threw it into his chest again, I wish I could go back.' "

cused was informed of his *Miranda* rights and questioned by police; however, the police stopped the questioning when the petitioner requested an attorney. *Edwards*, 451 U.S. at 479, 101 S.Ct. at 1882. The next morning, the police attempted to resume questioning the petitioner. After being informed of his *Miranda* rights, the petitioner stated that he was willing to talk and that he wanted to hear the taped statement of an alleged accomplice. *Id.* After listening to the tape, Edwards gave an incriminating statement that was later admitted at trial. *Id.* The Supreme Court held that

> when an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he had been advised of his rights. We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

*Id.* at 484–85.

The court "emphasize[d] that it is inconsistent with *Miranda* and its progeny for the authorities, at their instance, to reinterrogate an accused in custody if he has clearly asserted his right to counsel." *Id.* at 485, 101 S.Ct. at 1885.

In *Smith v. Illinois*, 469 U.S. 91, 105 S.Ct. 490, 83 L.Ed.2d 488 (1984), the United States Supreme Court stated that the rule in *Edwards*

> [E]mbodies two distinct inquiries. First, courts must determine whether the ac-

cused actually invoked his right to counsel. Second, if the accused invoked his right to counsel, courts may admit his responses to further questioning only on finding that he (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked.[10]

469 U.S. at 95, 105 S.Ct. at 492–93 (citations omitted).

There is no dispute that the petitioner actually invoked his right to counsel before the first statement was taken on August 16. The respondent argues that the petitioner invoked his right to counsel only to Detective Dudley and that Overton never knew that the petitioner had asked for an attorney. In light of the facts in this case, the court finds the respondent's argument to be inconsistent with well-established Supreme Court precedent.[11] First, the Franklin County Sheriff's Department and the Roanoke City Police Department were conducting a joint investigation of the same crime. Second, the first and second statements were both taken at the same location within a five-hour period. Furthermore, both interrogations concerned the same crime. It is unlikely that Overton would go to Roanoke and interrogate the petitioner without first contacting the Roanoke detectives who were also working on the case.[12] Therefore, not only is this case very similar to *Edwards*, there is also strong evidence that Overton had actual knowledge of the petitioner's request. The respondent's argument vitiates *Miranda* and *Edwards* by allowing repeated questioning of an accused individual who had invoked his right to counsel. *Miranda* and its progeny make clear that "an accused's request for an attorney is *per se* an invocation of his Fifth Amendment rights, requiring that all interrogation cease." *Edwards*, 451 U.S. at 485, 101 S.Ct. at 1885,

---

**10.** Petitioner's claims A(1) and A(3) essentially mirror the two parts of the second prong of this test. In Claim A(1), the petitioner essentially claims that he did not initiate further discussions with Overton. In Claim A(3), the petitioner claims that, even if he did initiate further discussions, he did not then knowingly and intelligently waive his right to counsel.

**11.** Specifically, the factual situation in the instant case is no different than the situation in *Edwards*. In *Edwards*, the court described the

two detectives who conducted the second interrogation as "colleagues of the officer who had interrogated Edwards the previous night." 451 U.S. at 479, 101 S.Ct. at 1882. As such, the fact that Dudley took the first statement and Overton took the second and third statements is irrelevant to the *Edwards* analysis.

**12.** The petitioner testified that prior to being interrogated by Investigator Overton, he saw Detective Dudley talking with Overton and Ferguson. Habeas Tr. at p. 206.

*citing Fare v. Michael C.,* 442 U.S. 707, 719, 99 S.Ct. 2560, 2568–69, 61 L.Ed.2d 197 (1979).

■ As to the first part of the second prong of the *Smith* test, the court must determine whether the petitioner initiated further discussions with the police. The respondent argues that the petitioner initiated contact with Investigator Overton when he stated that he wanted to explain the results of the polygraph test. The law is settled that a request to talk to an agent or a suspect's announcement that he had decided to cooperate and make a statement are clear situations of initiation of communication by the suspect. *United States v. Cummings,* 937 F.2d 941, 946–47 (4th Cir.), *cert. denied* 502 U.S. 948, 112 S.Ct. 395, 116 L.Ed.2d 345 (1991); *United States v. Evans,* 917 F.2d 800, 805 (4th Cir.1990).

■ However, it is clear from *Edwards* that an accused cannot initiate contact by making statements in response to subsequent police-initiated interrogation. 451 U.S. at 484, 101 S.Ct. at 1884–85. In the instant case, it is undisputed that the petitioner was taken to Appomattox on Sunday for a polygraph examination.[13] For the petitioner to explain the results of this examination, he had to know the results.[14] The petitioner could only have known the results if someone told him. In *Rhode Island v. Innis,* the Court stated that interrogation "refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." 446 U.S. 291, 301, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980). In *Henry v. Dees,* the Fifth Circuit held that informing the accused that he failed a polygraph examination constituted interroga-

tion.[15] 658 F.2d 406, 410 (1981). In the instant case, the petitioner would not have felt the need to have explained the results if the results had not been told to him. Therefore, the court holds that the petitioner's desire to explain the test results was a response to police-initiated interrogation represented by telling the petitioner the test results. As such, the petitioner's statement to Investigator Overton was not an initiation of contact.

■ Since the court has found that the petitioner did not initiate contact, it is not necessary to reach the second part of the second prong of the *Smith* test: whether the petitioner made a knowing and intelligent waiver of his rights. Such a determination must be made in light of the totality of the circumstances, including his background, intelligence, and the conduct of police. *Oregon v. Bradshaw,* 462 U.S. 1039, 1046, 103 S.Ct. 2830, 2835, 77 L.Ed.2d 405 (1983). The court notes that the facts of this case make it unlikely that such a waiver occurred.[16]

■ This court cannot imagine a more deliberate and egregious violation of *Edwards* than exists in this case. The petitioner invoked his right to counsel shortly after his arrest on August 16; however, that request was ignored. In the fifty hours following the petitioner's request for counsel, police officers from two jurisdictions conducted three taped interrogations, one polygraph examination and an unknown number of unrecorded interrogations. At no time during these interrogations was the petitioner's right to an attorney honored. If *Edwards* stands for anything, it stands for the proposition that when an accused invokes his right to counsel all questioning must stop until that request is honored. The petitioner's request

---

13. The court notes that the polygraph examination constitutes yet another custodial interrogation conducted without giving the petitioner the benefit of the counsel that he had requested.

14. The results must have shown that the petitioner did not tell the truth during the polygraph and/or that he had made statements inconsistent with his earlier statements. Otherwise, the petitioner would not have felt the need to attempt to "explain what went wrong" during the polygraph.

15. In *Henry,* the accused had been allowed to confer with an attorney prior to taking the polygraph examination; however, counsel was not present at the examination.

16. The petitioner has an I.Q. of 68 and had been held in continuous custody for almost two days. Furthermore, he was held *incommunicado:* the police had ignored his request for counsel, as well as his request to call his parents.

was not honored and therefore it was error to admit the third statement into evidence at trial. Therefore, the petitioner's writ is granted as to Claim A(1).

### 3. *Claim A(2)*

Petitioner also argues that the third statement is the tainted product of the two prior statements. It is important to note that this claim is independent from the claim that the third statement was taken in violation of *Edwards*. Even if the third statement was constitutionally-obtained, it could still have been excluded as the tainted product of the first two statements. The Fourth Circuit has addressed the issue of whether an initial confession taken in violation of *Edwards* taints a subsequent constitutionally-obtained confession. *McFadden v. Garraghty,* 820 F.2d 654 (1987).

In *McFadden,* the accused was taken into custody by Deputy Brown of the Amherst County Sheriff's Department on April 29. *Id.* at 655. The accused was then questioned by Investigator Morris of the Virginia Division of Forestry concerning certain fires that had been set in Amherst County (the "Amherst fires"). The accused invoked his right to counsel and Investigator Morris ceased the interrogation. *Id.* Deputy Brown, who had been informed by Investigator Morris that the accused had requested counsel, then attempted to question Mr. McFadden. McFadden once again invoked his right to counsel; however, Brown continued to discuss the matter. McFadden then agreed to speak to Brown and, after waiving his *Miranda* rights, gave a statement concerning the Amherst fires. *Id.* at 655–56. After this statement, McFadden was driven home. Later that night McFadden was again taken into custody, questioned and released. *Id.* at 656.

The next day, April 30, McFadden was arrested and charged with setting the Amherst fires. *Id.* McFadden was arraigned and counsel was appointed to represent him.

Subsequent to the appointment of counsel,[17] Chief Deputy Dixon of the Nelson County Sheriff's Department arrived to question McFadden about a break-in of a rescue squad building in Nelson County. McFadden waived his *Miranda* rights and consented to a search of his car. *Id.* An hour later, after McFadden had again waived his *Miranda* rights, he gave a statement concerning the Nelson County break-in and consent to search his house. On May 1, a search of McFadden's house and car produced items that had been stolen during two break-ins at a County. Chief Deputy Dixon questioned McFadden about the visitor center break-ins; McFadden orally waived his *Miranda* rights and admitted to participating in the second visitor center break-in. *Id.*

On May 6, Investigator Fisher of the Augusta County Sheriff's Department interrogated McFadden concerning the first visitor center break-in. McFadden orally waived his *Miranda* rights and confessed to the first break-in. McFadden was indicted for both visitor center break-ins. After two pre-trial hearings, his motion to suppress the consent given on April 30 and the statements he made on May 1 and May 6 was denied. *Id.* The statements and the evidence obtained in the search were admitted at trial and McFadden was convicted of both crimes. *Id.* at 656–57.

The Fourth Circuit held that questioning by Deputy Brown on April 29 concerning the Amherst County fires clearly violated *Edwards*. *Id.* at 658. However, relying on *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) and *Westover v. United States,* 384 U.S. 436, 494, 86 S.Ct. 1602, 1638, 16 L.Ed.2d 694 (1966) [18], the Fourth Circuit held that the "initial violation of *Edwards* did not preclude further questioning of appellant regarding the instant crimes." *Id.* at 661. In its analysis, the court stated,

> Although appellant was taken into custody by the Amherst County Sheriff's Department on both the evening of April 30 and

---

17. The court stated that it was unable to determine whether McFadden had yet spoken with his appointed counsel. *Id.*

18. It should be noted neither *Oregon v. Elstad* nor *Westover v. United States* involved an initial

*Edwards* violation. Instead, in both cases, the accused was not initially informed of his *Miranda* rights.

the afternoon of May 1, the interrogation by the Nelson and Augusta deputies was removed in time and place from the magistrate's office where he originally had been questioned. The Nelson and Augusta deputies adequately advised appellant of his *Miranda* rights. He was interrogated by separate and distinct law enforcement authorities, about different crimes. Of even greater import, however, is that appellant was not subjected to continuous custody. There were two breaks in custody which serve amply to sever any causal link between the initial unlawful interrogation and appellant's voluntary confessions.

*Id.* at 660–61 (citations omitted).

The facts of this case are very different than those set forth in *McFadden.* First, the petitioner was subjected to continuous custody. As such, there was no break to sever the "causal link" between the initial *Edwards* violation and the third statement. Second, the petitioner was questioned about the same crime in all three statements. Third, although the first statement was taken by Detective Dudley and the second and third statements were taken by Inspector Overton, it can hardly be said that these two officers represented "separate and distinct law enforcement authorities." Both were conducting a joint investigation of the same crime. Overton had first interrogated the petitioner in Roanoke within hours of Detective Dudley's interrogation. From the viewpoint of the petitioner, there could have been little difference between these two officers. Finally, McFadden was described as "an institutional police officer employed by the Lynchburg Training School and Hospital." *Id.* at 655. Also, McFadden was described as being personal friends with Deputy Brown and Chief Deputy Dixon. In stark contrast, the petitioner has an I.Q. of 68, no experience as a law enforcement officer and no personal relationship with Dudley or Overton. In short, the instant case is different from *McFadden* in almost every important factual aspect.

Although the petitioner's argument is strongly supported by *McFadden,* an even greater source of support can be derived from an examination of how the first two statements "tainted" the third statement. Such an analysis must be performed by examining the course of events from the petitioner's point of view. The petitioner had no way of knowing that the first two statements had been obtained in violation of his Fifth Amendment rights or that the trial court would not allow the statements into evidence. Instead, the two statements taken on August 16 provided the petitioner with two important misconceptions: (1) there is no need to request an attorney because the police will not provide one and (2) no harm could result from giving further statements because he had already given two incriminating statements.[19] Therefore, even if the petitioner initiated contact on August 18 and subsequently waived his *Miranda* rights, his actions were the result of the misconceptions or "taint" created by the first two statements. In other words, the petitioner thought that he had nothing to lose by giving a *third* incriminating statement.

The court cannot imagine a clearer example of a tainted confession, especially in light of the petitioner's low I.Q. When the petitioner was presented with the fact that something was "wrong" with his polygraph results, it is only logical that he would attempt to give an explanation. In fact, a review of the third statement shows that the petitioner's statements were basically confined to the polygraph results[20] until Overton expanded the scope of the interrogation.[21] Given the

---

**19.** For example, during the third statement Overton stated, "I want to stress that you have implicated yourself very much here in a previous interview and in this interview also." Correll 3 Tr. at p. 9. The statement came soon after the point that Overton had moved from discussing the polygraph results to discussing how the murder actually occurred.

**20.** The third statement makes it clear that the petitioner was concerned only with explaining

one question from the polygraph examination, which concerned what items were taken from the victim's body. Correll 3 Tr. at p. 2–3.

**21.** After informing the petitioner that Reynolds had taken a polygraph examination, Overton stated, "[a]nd isn't it a fact that after Mr. Bousman's body was removed from his trunk and pulled into the woods by the path by you and John [ ...] that you, yourself, threw the knife into him first." Correll 3 Tr. at p. 7.

facts of this case, the court finds that the petitioner's decision to give a third statement was influenced by circumstances surrounding the first two statements. As such, the court finds that the third statement was the tainted product of the first two statements obtained in violation of *Edwards*. Therefore, the petitioner's writ is granted as to Claim A(2).

### D. *Claim B: Ineffective Assistance of Counsel*

■ Petitioner raised Claims B(2)(a-f), B(4)(b), B(5), B(6) and B(7) in his state habeas petition. As discussed *supra*, Judge Ingram of the Danville Circuit Court held an evidentiary hearing on all of petitioner's ineffective assistance claims. At the hearing, petitioner was represented by two attorneys and presented the testimony of eight witnesses. Under 28 U.S.C. § 2254(d), a state court's factual findings are entitled to a presumption of correctness in federal court unless the petitioner can show the presence of one or more enumerated factors necessitating a finding that he did not receive a fair and adequate hearing of his claims. *Sumner v. Mata*, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981).[22] Petitioner has not produced evidence of any factor that would cast doubt on the fairness or adequacy of the hearing on his state habeas petition. Accordingly, this Court will defer to the findings of fact adopted by Judge Ingram.

Under *Strickland v. Washington*, 466 U.S. 668, 669, 104 S.Ct. 2052, 2055, 80 L.Ed.2d 674 (1984), the petitioner must meet a two-part test to show ineffective assistance of counsel. First, the petitioner must show that his attorney's performance was deficient. Counsel must have committed errors so serious that he was not functioning as the counsel guaranteed by the sixth amendment. *Id.* Petitioner must show that his counsel's representation fell below an objective standard of reasonableness. 466 U.S. at 688, 104 S.Ct. at 2064. Second, petitioner must show preju-

dice to his defense. 466 U.S. at 687, 104 S.Ct. at 2064. In meeting the prejudice prong, the petitioner must show a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. 466 U.S. at 694, 104 S.Ct. at 2068.

#### 1. *Claim B(1)(a-f)*

Petitioner makes the following claims concerning his trial counsels' failure to adequately investigate and elicit sources of available evidence regarding: (a) the petitioner's defense, (b) the petitioner's statements to the police, (c) the nature of the victim's death, (d) the background of petitioner and the other defendants and the admissions of defendant Richard Reynolds, (e) facts relating to the victim's alleged homosexual activities, and (f) facts to contradict statements of the co-defendants.

Claim B(1)(a) focuses on the trial counsel's statements to the trial judge concerning the petitioner's alibi witnesses. Judge Ingram found that counsel's statements concerning the petitioner's alibi defense were made to avoid having to disclose to the Commonwealth the names of any alibi witnesses. Judge Ingram also found that petitioner's counsel made a complete investigation of a possible alibi defense, including identification and investigation of potential alibi witnesses. Findings of Fact at pp. 9–12.

Claim B(1)(b) focuses on counsel's actions in investigating the circumstances of the third statement given by the petitioner. Judge Ingram found that petitioner's counsel thoroughly investigated the circumstances surrounding the three statements. Findings of Fact at pp. 4–8. Also, the transcripts of the suppression hearings held before and during trial demonstrate that petitioner's counsel had investigated and gathered evidence to support suppression of the three statements.

Claim B(1)(c) focuses on counsel's investigation of the nature of and the circumstances

---

**22.** The criteria are: (1) factual dispute was not resolved at state hearing, (2) inadequate factfinding procedure used by state court, (3) material facts not adequately developed at state court hearing, (4) state court lacked jurisdiction, (5) state court failed to appoint counsel for indigent petitioner, (6) state court hearing was not full, fair and adequate, (7) the applicant was otherwise denied due process of law at the state court hearing, and (8) evidence was insufficient to support state court's factual determination. 449 U.S. at 544–545, 101 S.Ct. at 767–768.

surrounding the victim's death. Judge Ingram found that trial counsel "questioned authorities about the knife, reviewed the fire department reports concerning the arson, and personally inspected the inside and outside of the car and its trunk. [Trial Counsel] did not see the word "help" which Correll alleges was scratched into the truck lid." Findings of Fact at p. 14. Judge Ingram also found that trial counsel "thoroughly discussed the evidence" with Dr. Oxley, the Roanoke Medical Examiner. Findings of Fact 16–17. Finally, Judge Ingram found that trial counsel had reviewed the State Police report of Dalton's polygraph test. Findings of Fact at p. 15.

Claim B(1)(d) focuses on the trial counsel's investigation of the background of the defendants and the admissions of defendant Reynolds. Judge Ingram found that trial counsel determined not to put on evidence of petitioner's non-violent nature after meeting with defense witness Ray Sigmon. Findings of Fact at 12–13. Judge Ingram also found that the petitioner "presented no evidence to support his allegations that other witnesses could have provided testimony of Correll's or Dalton's and Reynolds' reputations." Findings of Fact at p. 13.

Claim B(1)(e) focuses the evidence of the victim's homosexual activities. Judge Ingram found that "trial counsel made a deliberate, tactical decision" to present evidence of the victim's homosexual activities by means of a letter to the court. Findings of Fact at p. 17. Judge Ingram also found that "Correll presented no evidence at the hearing to substantiate his allegation that counsel could have presented admissible evidence of the homosexual encounter." Findings of Fact at p. 18.

Claim B(1)(f) focuses on the trial counsel's investigation of evidence to contradict the statements of the co-defendants. Judge Ingram found that trial counsel had examined the transcripts of Dalton's and Reynolds' confessions, had investigated the inconsistencies in these statements, and had reviewed the State Police report concerning Dalton's polygraph. Findings of Fact at pp. 13–15. Judge Ingram further found that "Correll presented no evidence to substantiate his allegation that Reynolds repeatedly stated that Correll did not commit the murder." Findings of Fact at p. 15.

In short, Claims B(1)(a-f) were presented at the hearing on petitioner's state habeas petition. Judge Ingram heard evidence on each of these claims and made factual findings supporting his conclusion that the petitioner's trial counsel provided constitutionally effective assistance of counsel. As stated *supra*, this court will defer to Judge Ingram's findings of fact. Therefore, this court finds that Claims B(1)(a-f) must be dismissed.

### 2. Claim B(3)

In Claim B(3), the petitioner alleges that trial counsel failed to present an adequate defense at trial. Aside from repeating many of the claims presented in the petitioner's other claims, this claim focuses trial counsel's failure to properly cross-examine defendant Dalton, Investigator Overton, Dr. Oxley, Connie Bryant, and Rhonda Small. Also, petitioner alleges that trial counsel failed to properly examine Donald Sigmon and improperly stipulated to the introduction of certain evidence and testimony. Judge Ingram made no specific findings concerning this claim; however, this court has reviewed the trial transcripts. Based upon this review, the court finds insufficient evidence to support petitioner's claim that his trial counsel were constitutionally ineffective with respect to their actions at trial. Therefore, Claim B(3) must be dismissed.

### 3. Claim B(4)(b)

In Claim B(4)(b), petitioner alleges that his trial counsel failed to seek a neurological examination or a continuance of the trial based on his incapacity. At the state habeas hearing, Judge Ingram found that trial counsel were justified in relying on the examinations performed by the court-appointed psychiatrists. Judge Ingram also found that this report indicated that there was no organic brain damage. Finally, Judge Ingram found that Correll was able to participate in his own defense. Findings of Fact at p. 18–19. Based upon these findings, to which this court must defer, the court finds that peti-

tioner's trial counsel was not constitutionally ineffective with respect to this claim. As such, Claim B(4)(b) must be dismissed.

#### 4. *Claim B(5)*

In Claim B(5), petitioner alleges that his trial counsel failed to adequately advise him of the consequences of waiving a jury trial. Judge Ingram found that trial counsel "thoroughly advised Correll of the consequences of the waiver of a jury." Judge Ingram also found that trial counsels' decision to waive the jury trial was guided by the petitioner's insistence on a complete alibi defense. Findings of Fact at pp. 19–20. This court defers to Judge Ingram's findings and concludes that trial counsel did not provide constitutionally ineffective assistance as to the waiver of the jury trial. Therefore, Claim B(5) must be dismissed.

#### 5. *Claim B(6)*

In Claim B(6), the petitioner alleges that his trial counsel failed to present any evidence contradicting the Commonwealth's evidence relating to the vileness of the crime. Judge Ingram found that the "petitioner presented no evidence to support the allegation that counsel failed to present evidence to mitigate the vileness of the crime." Findings of Fact at p. 21. The failure of the petitioner to develop material facts at the state habeas proceeding will only be excused for cause and prejudice. *Keeney v. Tamayo–Reyes,* 504 U.S. 1, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992). Petitioner has not alleged cause and prejudice; therefore, the court, will defer to Judge Ingram's finding. The court concludes that petitioner's trial counsel did not provide constitutionally ineffective assistance with respect to this claim and that Claim B(6) must be dismissed.

#### 6. *Claim B(7)*

■ In Claim B(7), the petitioner alleges that his trial counsel failed to introduce significant mitigating evidence relating to his psychological defects, incapacity, and mental retardation. At the state habeas hearing, Judge Ingram found that "the petitioner presented no evidence except for exhibit 8 to support the allegation that counsel failed to introduce significant mitigating evidence relating to psychological defects, incapacity and mental retardation." Judge Ingram also found "that petitioner's exhibit 8 contains negative as well as positive information about Correll's background." Findings of Fact at p. 22. The failure of the petitioner to develop material facts at the state habeas proceeding will only be excused for cause and prejudice. *Keeney v. Tamayo–Reyes,* —— U.S. ——, 112 S.Ct. 1715, 118 L.Ed.2d 318 (1992). Petitioner has not alleged cause and prejudice; therefore, the court, will defer to Judge Ingram's finding. Based upon these factual findings, this court concludes that petitioner's trial counsel did render constitutionally ineffective assistance with respect to the presentation of evidence in mitigation of punishment. Therefore, Claim B(7) must be dismissed.

#### 7. *Summary of the Ineffective Assistance Claims*

All of the ineffective assistance claims considered on the merits by this court were presented to Judge Ingram at the state habeas hearing. Judge Ingram adopted the proposed findings prepared by the Commonwealth and those findings are entitled to a presumption of correctness in this court. In addition to reviewing Judge Ingram's findings, this court has reviewed the entire record, including the transcripts of the trial, the sentencing and the state habeas hearing. Based upon this thorough review, the court is of the opinion that the evidence is insufficient to prove that petitioner's trial counsel were ineffective under the test in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Therefore, all of the petitioner's ineffective assistance of counsel claims must be dismissed.

#### E. *Claim F: Failure to Provide Exculpatory Materials*

■ In Claim F, petitioner alleges that the Commonwealth failed to provide certain exculpatory evidence to defense counsel prior to trial, specifically the petit larceny conviction of petitioner's codefendant, John Dalton, who testified against petitioner. At sentencing, the prosecution stated on the record that

he had inadvertently failed to disclose the shoplifting conviction. The trial court stated that although it would likely have been used to discredit Dalton, it had "absolutely no effect" on the court. Transcript of the Sentencing Hearing at p. 110.

■■■ Suppression by the prosecution of evidence favorable to the accused violates due process if a reasonable probability exists that the result of the proceeding would have been different had the evidence been disclosed to the defense. *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). A reasonable probability requires a probability sufficient to undermine confidence in the outcome. *Id.* at 682, 105 S.Ct. at 3383. The defense used Dalton's plea agreement and friendship with the third codefendant, Richard Reynolds, and dislike of petitioner as impeachment information at trial. The additional impeachment value of Dalton's conviction would be slight. In light of this and the trial court's statement that knowledge of the shoplifting conviction had "absolutely no effect", this Court cannot say that a reasonable probability exists that the outcome of petitioner's trial would have been different had the conviction been disclosed in a timely manner. Therefore, claim F must be dismissed.

### F. *Claim H: Death Sentence Was Excessive and Disproportionate*

■■■ Petitioner alleges in Claim H that imposition of his death sentence was excessive and disproportionate to the penalties imposed in similar cases as a result of the Virginia Supreme Court's failure to engage in an adequate proportionality review as contemplated under § 17–110.1(C)(2) of the Code of Virginia. Proportionality review is not required by the United States Constitution. *Pulley v. Harris*, 465 U.S. 37, 50, 104 S.Ct. 871, 879, 79 L.Ed.2d 29 (1984). Even when state law requires a proportionality review, federal habeas relief may not be granted for errors of state law. *Id.* at 41, 104 S.Ct. at 874–75. Furthermore, the Virginia Supreme Court in *Correll* stated that it had reviewed the records in all capital cases presented to that court under the current capital murder statutes. 352 S.E.2d at 361.

The court lists the cases it reviewed in Footnote 5. *Id.* at 361 n. 5. Such a review was upheld by the Fourth Circuit in *Coleman v. Thompson*, 895 F.2d 139, 146–47 (4th Cir. 1990). Accordingly, this Court must dismiss Claim H.

### G. *Claim K: Failure To Consider Mitigating Circumstances*

In Claim K, petitioner alleges that the trial court failed to consider the mitigating circumstances before imposing the death penalty. The Supreme Court of Virginia considered this claim on direct appeal. *Correll v. Commonwealth*, 352 S.E.2d 352, 360 (Va. 1987). That court held that the mitigating factors tended to negate future dangerousness, but were not of such weight to prevent the imposition of the death penalty based upon vileness. *Id.* The Virginia Supreme Court also found that the trial court had considered the mitigating evidence and "imposed the death penalty without the influence of passion, prejudice, or other arbitrary factor." *Id.* This court has reviewed the transcript of the petitioner's sentencing and found nothing to indicate that the trial court failed to consider the mitigating circumstances. As such, Claim K must be dismissed.

### H. *Claim L: Evidence of Vileness Was Insufficient*

In Claim L, the petitioner alleges that the evidence of vileness was insufficient to support the imposition of the death penalty. The Supreme Court of Virginia considered this claim on direct appeal. *Correll v. Commonwealth*, 352 S.E.2d 352, 360 (Va.1987). That court found that the "trial court found both an aggravated battery and depravity of mind, and both findings are amply supported by the record." *Id.* This court has reviewed the trial and sentencing transcripts and finds that there existed sufficient evidence to support the trial court's imposition of the death penalty based upon vileness. Therefore, Claim L must be dismissed.

### I. *Claim M: Denial of Motion for Post–Sentence Report*

■■■ In Claim M, petitioner alleges that the trial court denied him due process when

it denied his motion for a post-sentence report as required by Va.Code § 19.2–264.5. The trial judge, however, did consider a pre-sentence report before he imposed the death penalty. The Virginia Supreme Court decided in *Correll v. Commonwealth,* 352 S.E.2d 352 (Va.1987), that the post-sentence report requirement is restricted to jury cases. The Court held that the restriction is implicit in the language of the statute and that the trial court complied with the tenor of the statute, resulting in no prejudice to petitioner. *Id.* at 359. Federal courts are bound by a state's interpretation of its own law. *See, Garner v. Louisiana,* 368 U.S. 157, 166, 82 S.Ct. 248, 253, 7 L.Ed.2d 207 (1961). Petitioner has not stated a federal constitutional issue in his petition.[23] Accordingly, Claim M will be dismissed.

### III. CONCLUSION

For the reasons stated, the court finds that the petition for a writ of habeas corpus must be granted. An appropriate order consistent with this memorandum opinion shall be entered this day.

### FINAL ORDER

In accordance with the memorandum opinion filed this day it is

### ADJUDGED AND ORDERED

that the petition of Walter Milton Correll for a writ of habeas corpus is **GRANTED.** The convictions and sentences imposed for the robbery and murder that occurred on August 11, 1985, are vacated and the Commonwealth is directed to either re-try petitioner or release him as to these offenses within six (6) months from this date. This order in no way affects any other sentence petitioner might be serving.

---

**23.** In his response in opposition to the motion to dismiss, Correll argues that the question to be resolved is whether the statute itself meets constitutional requirements. Previously, Correll has stated this claim solely in terms of the trial court's alleged violation of the statute. Inasmuch as Correll has never before raised the constitutionality of the statute itself, this Court will not reach that issue now.